## WELLS & RICHARDSON CO. v. ABRAHAM et al.

(Circuit Court, E. D. New York. April 20, 1906.)

1. INJUNCTION—CONTRACTS—INDUCING BREACH.

Complainant manufactured a proprietary medicine, which it sold under a trade-mark and only to wholesale dealers under contracts which bound them to sell, only at a certain price, and only to retail dealers who also had contracts with complainant fixing the price at which the medicine should be sold to consumers. *Held*, that such contracts were legal, and that complainant was entitled to an injunction restraining defendants, who, not having entered into any contract with complainant, were therefore not entitled to buy and sell the medicine, from inducing any purchaser who had made such a contract to violate the same by selling to defendants, or from knowingly purchasing from any such person in violation of his contract, and also from selling the medicine to consumers after the cartons and labels containing the directions for its use had been removed from the bottles.

2. SAME—EVIDENCE OF INTENTION.

The fact that defendants, who were shown to be selling large quantities of the medicine to consumers at less than the prices fixed by complainant, before doing so removed from the bottles all cartons and labels containing numbers which would enable complainant to trace the original purchaser, in the absence of evidence showing to the contrary, was sufficient to authorize a finding that defendants knowingly participated in the breaches of the contracts between the sellers and complainant.

In Equity. On motion for preliminary injunction.

Steuart & Steuart (Frank F. Reed and Edward S. Rogers, of counsel), for complainant.

Paul Grout (Edmond E. Wise, of counsel), for defendants.

THOMAS, District Judge. The complainant owns a secret process for making a medicinal product known as "Paine's Celery Compound," or "Celery Compound," for many years, extensively sold under a registered trade-mark showing a head of celery. The article is placed in bottles bearing the word "Paine's" on one side, and the words "Celery Compound" on the opposite side, while on the cork is a label showing the trade-mark and carrying the words "Paine's Celery Compound." On a third side of the bottle is a label showing a larger picture of the trade-mark, whereon is printed in large letters, "Celery Compound," while below are the words "Paine's Celery Compound. A True Nerve Tonic, an Active Alterative, a Reliable Laxative, and Diuretic. It Restores Strength, Renews Vitality, Purifies the Blood, Regulates the Kidneys, Liver and Bowels. Price $1.00. Prepared by Wells, Richardson & Co., Sole Proprietors, Burlington, Vt." On the fourth side appears, in English and German, the following:

"Directions for using Paine's Celery Compound. The dose should be graduated to suit the patient, enough being taken to act upon the bowels and keep them regular, but lessening the dose if it acts too strongly: for adults, from a teaspoonful to a tablespoonful in a little water four times a day, before eating and at bed time; lessen the dose for children according to age. In bad cases of Neuralgia and Rheumatism double the above dose for the first two days, and in severe and obstinate cases, or in any disease complicated with Scrofula, add one-eighth ounce of Iodide of Potassium to each bottle, then use the medicine faithfully. Prepared by Wells, Richardson & Co., Sole Proprietors, Burlington, Vt."

On each of the two labels last described are stamped numbers, whereby the persons to whom the complainant delivered the bottle may be traced. Around the bottle is wrapped a pamphlet, showing the picture, and noting the history, of "Prof. Edward E. Phelps, M. D., L. L. D., the Eminent Discoverer of Paine's Celery Compound," followed by a disquisition on the nervous system, the relation of the nerves to the stomach, liver, kidneys, and heart, a great number of pictures of, and communications from persons, who relate their experiences in the use of the medicine, and much other matter intended to illustrate the curative qualities of the medicine. The bottle and pamphlet are packed in a carton, one side of which shows, in a variety of colors, the matter appearing on the third above-described side of the bottle. Another side states that the compound is "A Reliable Medicine" for certain diseases enumerated, and gives the directions for its use as stated on the bottle. The same substantially is repeated in German on another side, while the fourth side announces for what the compound is a remedy. In each carton is an envelope containing samples of "Wills' English Pills," and recommending their use in certain cases supplementary to the compound.

The defendants, under the name of Abraham & Straus, are among the great merchants in New York, and sell at a cut price the com-

pound, in the original bottles, stripped of carton, pamphlet and all else, including labels, save the small circular label on the cork above described. The defendants do this in defiance of complainant's forbiddance that they sell the goods at all, unless they comply with the "direct contract system," instituted by the complainant. Under such system the complainant sells its product only to wholesale or jobbing druggists who will agree with the complainant that they will only sell at stated prices, and discounts to such dealers as have executed contracts with complainant agreeing not to sell for consumption except at the prices fixed by the complainant, and that they will not sell at all to dealers who have not similar contracts with the complainant. This system opens the field to all dealers who will agree to observe the fixed prices, and limit sales for the purpose of reselling to those who have agreed to such terms. The defendants knew of this system. They rejected its opportunities. They, by themselves, their agents, or other persons, induced or co-operated with some vendee bound by such contract to sell them the product, and to save their vendor the penalties of a breach of the contract the defendants stripped the packages to the bare glass, save the miniature label on the cork, and in this naked form have and are marketing the compound. The defendants remove the cartons and labels because they carry stamped thereon serial numbers, whereby the bottle may be traced from the complainant to the retailer or wholesaler. This preserves the secrecy of their operations. The result is that the defendants have and sell the product made by complainant, because they surreptitiously obtain it from persons who have agreed not to sell it to them.

The defendants urge that the evidence does not show that they purchased it from a person interdicted by the contract from selling it. When a bottle of medicine is despoiled of its very prescription, the statement of the diseases for which it may be used, and this for the obvious purpose of shielding a contract breaker, the evidence of connivance and participation in the breach of the contract is sufficient. The doubt that Judge Lacombe entertained in Bobbs-Merrill Co. v. Straus, decided August 14, 1904, does not exist in the case at bar.[1]

But has the complainant a remedy in this suit? The contracts with the complainant's vendees are legal. Resort need not be had to the voluminous briefs submitted, for the defendants in their brief say:

"The validity of these contracts as between the parties is nowhere attacked. On the contrary, the whole argument proceeded on the theory that, though as between the parties thereto such contracts could probably be enforced, third parties who did not assent thereto, and who were under no contractual obligation to the complainant, could not in the absence of proof of fraud or conspiracy be compelled to observe such contracts, in the case of articles made under secret processes, any more than if such articles were not made under

[1] In the memorandum filed by Judge Lacombe in the case of Bobbs-Merrill Co. v. Straus, he says that where the record does not show whether defendants bought from a jobber, thus obtaining a reduced price or from a person who had already paid the full retail price, the court ought not to undertake on preliminary motion to render a decision which possibly could not be reviewed by the appellate court.—Editor.

secret processes. and that the patent cases which granted such remedy had no application to the case at bar."

The concession as to the legality of the contract accords with the decision in Park & Sons Co. v. National Wholesale Druggists' Association, 175 N. Y. 1, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578; Garst v. Harris, 177 Mass. 72, 58 N. E. 174; Garst v. Charles, 187 Mass. 144, 72 N. E. 839.

But the defendants contend that the defendants cannot be enjoined from purchasing the goods, or selling them after purchase. That proposition in connection with the facts appearing amounts to this: That the complainant's vendees are legally bounden by contract not to sell to the defendants, but that the defendants may, so long as they use neither force nor fraud, intentionally co-operate with them to do an illegal act—that is, break the contract—and be immune. The briefs abound in decisions, but no precedent should be required. A. is intentionally doing B. a legal injury. C. intentionally induces A. to do the injury. He solicits that it be done. He pays money to the doer of it to tempt him to do the act; that is, A. and C. unite, connive, agree to procure A. to break his contract, so that C. may get complainant's goods, which the latter has committed to A. upon the trust that they shall not be delivered to C., and others similarly situated. In such an instance the law should have sufficient inherent integrity to enable it to lay fast hold of A. and C., and stop both such deliberate breach of obligations and the advantages that the persons implicated in it are gaining. The law permits the complainant to use the direct contract system to maintain the price of its medicine, so that it shall not be the subject of capricious sales at varying prices. The complainant is under no obligation to sell to the defendants. The defendants have no right, equitable or legal, to insist upon sales to them. The complainant sells to others only upon their solemn stipulation that they will not sell to persons situated as are the defendants. The defendants induce them to break such contract, and take part with them in breaking it, and get the goods, not by rightful purchase, because their vendors have no right to transfer the title to defendants, but by procuring these vendors to deliver to the defendants the goods, knowing that they have agreed with the complainant, upon its parting with title to its vendees, that the latter would not give title to these defendants. Remember that it is conceded that the contract is good and legal between the parties. If so, the defendants have attempted to take title from a person who has no right to transfer the legal title to any person of the class to which the defendants belong. Hence the defendants get goods by procuring the avoidance of another's obligation that he will not give it to them. Whatever may be said argumentatively, no sane conscience can justify one man inducing another to betray a legal obligation. The point of wrong should not be missed. It is not primarily in selling a product which the makers have limited to be sold by others, of which the defendant is not one. The very vital wrong is that the defendants have obtained and are obtaining the goods by inducing others, not entitled to sell to them, to make sale to them, whereby the defendants

come into possession by doing the complainant a legal injury, a wrong, that makes such possession wrongful. A contract prohibiting alienation to a particular class is held to be lawful. It is admitted to be lawful. How, then, can the restriction upon alienation become unlawful in a court of equity, and how can a third person be heard to declare it unlawful, when an attempt is made to enjoin one from inducing a party to it to violate it? Is it valid at law and void in equity? If it is valid, it is property, and a court should be authorized to protect it, as any other property may be protected that is menaced by a wrongdoer. The law of the land accords with good morals. In Heath v. American Book Co. (C. C.) 97 Fed. 533, the defendant knowingly induced the schoolbook board of counties to purchase books from him, and discard those of the plaintiff, which they by contract were obligated to take. The defendant was held liable for damages. No fraud or misrepresentation was alleged. The learned judge followed Lumley v. Gye, 2 El. & Bl. 216, in which a singer was maliciously induced by defendant to break her contract with another, and the defendant was held liable for damages. In Angle v. Chicago, etc., R., 151 U. S. 1, 14 Sup. Ct. 240, 38 L. Ed. 55, the plaintiff was prevented from completing a contract by the defendant bribing its officers and inducing by false allegations the Legislature to withdraw a grant of land, and a bill in equity to reach the property held by the defendant and adjudged applicable to the payment of plaintiff's damages was sustained. The opinion states that "it has been repeatedly held that if one maliciously interferes in a contract between two parties, and induces one of them to break that contract, to the injury of the other, the party injured can maintain an action against the wrongdoer," and in support of this instances Green v. Button, 2 Cr. Mees. & R. 707; Lumley v. Gye, 2 El. & Bl. 216; Bowen v. Hall, 6 Q. B. D. 333, 337; Walker v. Cronin, 107 Mass. 555; Jones v. Stanly, 76 N. C. 355, 356; Haskins v. Royster, 70 N. C. 601, 16 Am. Rep. 780, and thereupon the opinion proceeds:

"Under these authorities, if the Omaha company had by its wrongful conduct simply induced the portage company to break its contract with Angle, it would have been liable to him for the damage sustained thereby. A fortiori, when it not only induces a breach of the contract by the portage company, but also disables it from performance."

In Moran v. Dunphy, 177 Mass. 485, 59 N. E. 125, 52 L. R. A. 115, 83 Am. St. Rep. 289, it is said:

"But in view of the series of decisions by this court from Walker v. Cronin, 107 Mass. 555, through Morasse v. Brochu, 151 Mass. 567, 25 N. E. 74, 8 L. R. A. 524, 21 Am. St. Rep. 474; Tasker v. Stanley, 153 Mass. 148, 26 N. E. 417, 10 L. R. A. 468; Vegelahn v. Guntner, 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443; Hartnett v. Plumbers' Supply Association, 169 Mass. 229, 47 N. E. 1002, 38 L. R. A. 194, and Weston v. Barnicoat, 175 Mass. 454, 56 N. E. 619, 49 L. R. A. 612, to Plant v. Woods, 176 Mass. 492, 57 N. E. 1011, 51 L. R. A. 339, 79 Am. St. Rep. 330, we cannot admit a doubt that maliciously and without justifiable cause to induce a third person to end his employment of the plaintiff, whether the inducement be false slanders or successful persuasion, is an actionable tort."

See, also, Doremus v. Hennessy, 176 Ill. 608, 52 N. E. 924, 54 N. E. 524, 43 L. R. A. 797, 802, 68 Am. St. Rep. 203.

In Garst v. Charles, 187 Mass. 144, 72 N. E. 839, it appears that the defendant and one Bickford, persons separately engaged in the retail drug business, agreed that Bickford should buy of the plaintiff a proprietary medicine manufactured by him under a contract, wherein he agreed not to sell it at retail at less than a specified price, and that subsequent purchasers should obtain and sell it only under such agreement. Bickford made the purchase and turned it over to the defendant, who advertised and sold it at less than the specified price. The opinion, after stating this history, continued:

"All this was in pursuance of a conspiracy between the defendant and Bickford that Bickford should make this contract and break it, to the injury of the plaintiff, for the benefit of the defendant. A conspiracy to deprive one of the benefit of a contract with another is unlawful. Carew v. Rutherford. 106 Mass. 1, 8 Am. Rep. 287; Walker v. Cronin, 107 Mass. 555; Vegelahn v. Guntner, 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443; Plant v. Woods, 176 Mass. 492, 57 N. E. 1011, 51 L. R. A. 339, 79 Am. St. Rep. 330. The defendant's arrangement with Bickford that he should break the contract was a wrong upon the plaintiff, intended for the defendant's advantage. The scheme was fraudulent. The purpose of the defendant was to induce the plaintiff to part with his property at a comparatively low price to a person who was, in fact, a retail druggist, and who represented by his words and conduct that he wanted the medicine to sell at retail, and who agreed not to sell it at less than the regular retail price, when, in fact, he was obtaining it under an arrangement to turn it over to the defendant at the wholesale price, to be sold by him at retail at less than the regular price. The defendant was a party to this scheme of fraud, and presumably was the author of it. He should be held liable for the wrong. Exchange Telegraph Co. v. Central News (1897) 2 Ch. 48; Dodge Co. v. Construction Information Co., 183 Mass. 62, 66 N. E. 204, 60 L. R. A. 810, 97 Am. St. Rep. 412. In this respect the case is very different from Garst v. Hall & Lyon Co., 179 Mass. 588, 61 N. E. 219, 55 L. R. A. 631. See, also, Taddy et al. v. Sterious et al. (1903) 1 Ch. 354. The suit is one which calls for relief in equity. The damages are of a kind that cannot be accurately computed or easily estimated. The remedy at law is not complete and adequate, and an injunction with damages for the injury already suffered gives the only proper relief."

In American Law Book Co. v. Edward Thompson Co. (Sup.) 84 N. Y. Supp. 225, Justice Bischoff states the facts and his conclusions as follows:

"By preliminary injunction in an action for injunctive relief the plaintiff seeks to restrain the defendant from making agreements with subscribers to the plaintiff's encyclopedia, whereby the defendant undertakes to indemnify these subscribers against claims for damages for their breach of contract in declining to receive and pay for the plaintiff's books, and from conducting and defraying the expenses of the defense to any action brought against the subscriber by the plaintiff. The complaint alleges that these agreements have been systematically offered by the defendant to the plaintiff's subscribers for the purpose of causing them to subscribe to the defendant's encyclopedia, and to repudiate their subscriptions for the work published by the plaintiff; and the allegations further disclose the making of intentional misrepresentations by the defendant to these subscribers as to the relative merits of the encyclopedias for the purpose of inducing the breach of contract. The defendant admits the making of the agreements in question, but asserts that the plaintiff has no remedy in equity upon the allegations of the complaint; the contention being that the plaintiff has his remedy at law for each contract broken, that the party to that contract has the right to break it and pay damages, and that what the party can do another person may ask him to do without re-

straint by injunction.' It is also argued that the cases in which an injunction has been granted to prevent the solicitation of a breach of contract are found to have involved only contracts for personal services, and that there is no precedent for such an injunction as the plaintiff seeks. If there be no exact precedent for this injunction, none is needed. The complaint avers, and the affidavits support the averment, that the defendant is engaged in an attempt to obtain business which the plaintiff has secured, having no regard to fairness of competition, but with resort to trick and device. Whether the subscribers are in each instance actually led by the defendant's misrepresentations to break the particular contracts is not important, and is not an essential averment of the complaint. Intentional false statements, made with a view to obstruct the plaintiff's business and to divert it to the defendant; are charged, and the solicitation of the subscriber's breach of contract is but a more active step in the same scheme of unfair competition. The fraudulent intent, followed to fruition in the actual inducement to persons dealing with the plaintiff to break their contracts for the intended benefit of the defendant, and to the intended injury of the plaintiff, is the basis of the defendant's wrong; a wrong which our system of remedial justice recognizes as the subject of relief."

In Dr. Miles Medical Co. v. Goldthwaite (C. C.) 133 Fed. 794, the defendant was restrained from interfering with contracts, similar to those now under consideration, by inducing their violation by the parties thereto, and from selling the medicine as complainant's in other than the original packages and at the contract price. In Dr. Miles Medical Co. v. Platt, 142 Fed. 606, and two other cases (U. S. Cir. Ct. N. D. of Ill.), Judge Kohlsaat made a similar holding, as did Judge Cochran in Hartman v. Park (U. S. Cir. Ct., E. D. of Ky.) 145 Fed. 358.

The case at bar must be carefully distinguished from cases where the purchase is from one who has a right to sell to the purchaser. Such was Keeler v. Standard Folding Bed Co., 157 U. S. 660, 15 Sup. Ct. 738, 39 L. Ed. 848. Cases must also be differentiated where the facts do not even show a contract. Such was Bobbs-Merrill Co. v. Straus (C. C.) 139 Fed. 155. In Garst v. Hall & Lyon Co., 179 Mass. 588, 61 N. E. 219, 55 L. R. A. 631, it is said:

"It is not averred that the defendant ever made any contract or agreement with the plaintiff, or had any dealings with him. No fraudulent act or conduct of the defendant in obtaining the medicine is set out, although the word 'fraudulently' is used in characterizing his acts. This word adds nothing to the averments of fact in the bill. The statement of the alleged fraud is too general to be the foundation of a decree. Nichols v. Rogers, 139 Mass. 146, 29 N. E. 377; Nye v. Storer, 168 Mass. 53, 46 N. E. 402. The averments of the bill in this particular would be entirely satisfied by showing a purchase of the medicine by the defendant from a person who bought it of the plaintiff's vendee, or from one who bought it of a purchaser from the vendee. The agreed statement of facts shows that the defendant obtained it in this way: The defendant did not buy the medicine of the firm of wholesalers who received it from the plaintiff, and who agreed to sell it subject to the above conditions, but bought it of a person who bought either from this firm, or from a purchaser from this firm."

If the defendants in the case at bar stood in a like innocent condition, why have they not proved the same under their oaths and shown that they purchased in good faith and from a person, who so far as they had notice, could sell without breach of a contract not to sell to them. As already stated, the effort to hide the history of their purchase is sufficient evidence of their unlawful participation

in the breach of the contract. But the fact of selling the goods thus obtained is not the only legal injury by the defendants to the complainant. They tear the very prescription from the bottles, so that the consumer may not know how to use the medicine, whether he is using it advantageously or injuriously, and the defendants by removing all enumeration of the diseases for which the medicine may be used, deprive the purchaser of the complainant's advice and representations in such regard. This seems to be a ruthless proceeding, both as regards the consumer and the complainant. The defendants urge that the medicine has an element—alcohol—that is dangerous for certain diseases enumerated by the complainant. Plainly, then, the medicine should be administered with care. But the defendants send broadcast the remedy without limitation as to dose or disease. This is a palpable menace to the patient, and to the complainant's business, and should be enjoined. Dr. Miles Medical Co. v. Goldthwaite (C. C.) 133 Fed. 794; Hartman v. Park (U. S. Cir. Ct., E. D. of Ky.) 145 Fed. 358. But the defendants, vigorously engaged in selling the medicine, urge that it is dangerous for certain diseases for which the complainant advertises it, and that the complainant, thus inequitable, should not be heard against the defendants, who are using their ample opportunities to market this very medicine, so alleged by themselves to be dangerous. This is a strange attempt at defense. The claim that Dr. Phelps' participation in the discovery of the product is not as asserted in the complainant's literature does not prevent defendants from taking advantage of any fame such alleged connection of Dr. Phelps has produced for the remedy. However, it is not perceived that the representations regarding his relation to it are necessarily false. The other affirmative defenses raised by the defendants to shield themselves are not approved. Dr. Miles Medical Co. v. Platt, 142 Fed. 606, and other cases (U. S. Cir. Ct., N. D. of Ill.).

The complainant is entitled to an order (1) restraining the defendants, their agents and servants, and all persons acting in concert or connivance with them from purchasing, directly or indirectly, the compound from any person who has entered into the contract above stated with the complainant, or from any person who has not entered into such contract, where defendants have notice or knowledge of such relation or absence of contractual relation to the complainant, and restraining the defendants, their agents and servants, and all persons acting in concert and connivance with them from selling such compound now or hereafter obtained from any such person or persons; (2) in any case where the defendants may become authorized to sell the compound, restraining them from doing so, unless the package containing it bears all the directions for using Paine's Celery Compound, and the precise representations as to the purposes and diseases for which it may be taken, as shown both on the label and the carton containing the bottle.

The details of the terms and scope of the injunction will be determined more precisely upon the settlement of the order herein. At the time of settling the order, ruling on the exceptions to the answer herein will be made.